_____
                                               )

| | |
|---|---|
| MARGARET GODFREY,<br>            Plaintiff, | )<br>)<br>) |
| | ) |
| v. | )      **CIVIL ACTION** |
| | )      **NO. 10-40075-TSH** |
| MICHAEL J. ASTRUE, as Commissioner of<br>Social Security Administration,<br>                  Defendant. | )<br>)<br>) |

_____ )

## <u>MEMORANDUM OF DECISION AND ORDER ON PLAINTIFF'S MOTION TO REVERSE OR REMAND THE DECISION OF THE COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION (Docket No. 13) AND DEFENDANT'S MOTION FOR AN ORDER AFFIRMING THE DECISION OF THE COMMISSIONER (Docket No. 18)</u>
### March 14, 2012

**HILLMAN, M.J.**

### <u>Nature of the Proceeding</u>

This is an action for judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") denying an application for Social Security disability benefits by Plaintiff, Margaret Godfrey ("Godfrey"). Godfrey has filed Plaintiff's Motion to Reverse or Remand the decision of the Commissioner of the Social Security Administration (Docket No. 13). Defendant, Michael J. Astrue, as Commissioner Social Security Administration has filed a cross-motion, Defendant's Motion for an Order Affirming the Decision of the Commissioner (Docket No. 18).

**Procedural History**

On February 7, 2007, Godfrey filed applications with the Social Security Administration ("SSA") for Social Security disability benefits on behalf of herself and her children (*Tr.,* at 101-109)[1], alleging she had been disabled since July 18, 2006 due to physical and mental impairments. Godfrey alleged that she was limited in her ability to work due to "drop foot and leg problem, learning disability". (*Id.*, at 120). The claim was denied and after exhausting her administrative remedies, Godfrey seeks review of the Commissioner's decision in this Court.

Godfrey seeks reversal of the Commissioner's decision, or, in the alternative, remand to the Administrative Law Judge ("ALJ"), on the grounds that the decision was "against the substantial evidence on the entire record and in violation of the Social Security Act ("Act"), its effectuating regulations, and the Commissioner's policy statements." *Pl's Mot. To Reverse Or Remand The Dec. Of The Comm.* (Docket No. 13). The Commissioner asserts that the ALJ's decision is supported by substantial evidence on the record and therefore, should be affirmed.

**Background**

*1. Educational and Occupational History*

Godfrey was born in 1965 in Holden, MA and resides in Otter River, MA. She completed 11th grade and attended special education classes for reading and writing. (*Tr.*, at 125, 269). Godfrey's employment history includes work as a banquet waitress at a hotel, paper folder factory, key cutter at a key company, and packer at a factory. (*Id.*, at 121). Godfrey alleges she has been unable to work since July 18, 2006, which, as more fully detailed below, is the date she suffered her injury. (*Id.*, at 25-29).

---

[1]A transcript of the official record has been filed under seal with the court, (Docket No. 15)("*Tr.*")

## 2. Medical History

Godfrey sustained an injury to her leg while playing soccer on July 18, 2006 (*Id.*, at 120). On July 19, 2006, Dr. Kaushik Bagchi diagnosed Godfrey with a right tibial plateau fracture and performed surgery including placing an external fixator within the patient; this was a temporary treatment until soft tissue conditions permitted a permanent fix of the injury. (*Id*, at 476-477, 479-480). Godfrey was found to have co-existing foot drop resulting from her injury. (*Id.*). Godfrey had an additional surgery on July 26, 2006 to remove the temporary external fixator and inserted a permanent locking plate. (*Id.*, at 469-470). On September 7, 2006, Godfrey was evaluated for physical therapy to address her drop foot and issues related to the fracture; she underwent physical therapy from September 2006 through January 2007. (*Id.,* at 232-247, 330).

On December 12, 2006, Dr. Bagchi noted Godfrey's foot drop remained, though was improving and that the tibial plateau fracture had healed very well and was in good position with the hardware intact. (*Id.*, at 330). Dr. Bagchi noted that due to her persistent limp and weakness, Godfrey was not able to work at that time. (*Id.*). On December 18, 2006, Godfrey's physical therapist noted that Godfrey ambulated with a cane and was driving, but her "stability and balance remain[ed] poor" with her right ankle. (*Id.*, at 244). Godfrey had made slow progress in building up strength and increasing her range of motion; pain levels remained stagnant. (*Id.*). In January 2007, Dr. Bagchi noted that Godfrey's injury may make it "extremely difficult or impossible to go back to the previous job that requires a lot of standing, walking and stair climbing," and recommended "a sedentary occupation." (*Id.*, at 329). Subsequently, on July 24, 2007, Dr. Bagchi noted that Godfrey's fracture was healed, her footdrop was "resolving," but that patient stated that she had lateral-sided knee pain. (*Id.*, at 328).

After an examination on March 9, 2007, Dr. Russell, Godfrey's primary care physician, provided a medical opinion to the Disability Determination Services of Worcester regarding Godfrey's ability to perform work related activities. Dr. Russell stated Godfrey had the following limitations: sitting for no longer than 20 min at a time, standing for 20-25 minutes, walking to 100 feet at a time, lifting and carrying 20 pounds at a time. (*Id.*, at 251). No psychiatric disorder was addressed at the time (*Id.,* at 256-57). Dr. Russell noted constant pain at an intensity of 3 on a scale of 10 (with 10 being most painful) and pain at night of 7. (*Id.,* at 252). Dr. Russell listed Ibuprofen and Tylenol as medications that were generally effective for Godfrey's pain.

In March 2007, a physical Residual Functional Capacity Questionnaire ("RFC") was completed based on a review of Godfrey's medical records. (*Id.,* at 260-267). The medical consultant imposed the following limitations on Godfrey as the result of her tibia fracture (primary diagnosis) and drop foot (secondary diagnosis): (1) she could occasionally lift/carry ten pounds and frequently lift/carry under ten pounds; (2) she could stand and/or walk at least two hours in an eight-hour work day; (3) she could sit, with normal breaks, up to six hours in an eight-hour work day; (4) her ability to push/pull was limited only by the her lift/carry restrictions; (5) she could occasionally climb stairs, kneel, crouch and crawl; (6) she could frequently balance and stoop; and (7) she should avoid concentrated exposure to extreme hazards (machinery, heights, etc.). (*Id.*) The medical consultant noted that Godfrey's treating/examining sources conclusions concerning her limitations did not differ significantly from his. (*Id.*, at 267).

In October 2007, Plaintiff complained to Dr. Russell that she had trouble sleeping and a pain level of 8 on a scale of 10 with Oxycodone no longer effective for the pain. (*Id., at* 437). In

April 2008, after an increased dosage of Oxycodone in the evening, Godfrey reported that her pain level was down to a level of 3 and that she was satisfied with her pain control. (*Tr., at* 416).

In March 2009, Dr. Russell completed a physical RFC regarding Godfrey in which she concluded that the Godfrey suffers from chronic pain due to the right tibial fracture. (*Id.,* at 566). Pain levels were noted as 7 on a scale of 10 without medication and a level of 2-3 with pain medication. (*Id.*). Dr. Russell additionally opined that Godfrey is not a malingerer and her impairments can be expected to last at least twelve months. Dr. Russell indicated that Godfrey walks with a limp and would have very poor functional limitations if placed in a competitive work situation. She also indicated that Godfrey had the following physical limitations: (1) she could walk no more than half a city block without rest or severe pain; (2) she could sit continuously for no more than forty-five minutes and stand continuously for no more than two hours; (3) in an eight hour work day, she could sit and stand, in total, no more than two hours; (4) she would require unscheduled breaks during an eight hour work day; (5) she would be required to use a cane; and (6) in a competitive work situation, she could lift less than ten pounds occasionally. (*Id.*, at 567-68). Although not asked on the questionnaire, Dr. Russell noted that Godfrey's illiteracy was a limitation on her ability to work. (*Id.,* at 570).


### 3. *Mental Limitations*

On May 12, 2006, Dr. Russell advised Godfrey to make an appointment to be seen for a depression evaluation after noting Godfrey's complaints of feeling depressed, having low energy, crying, and lashing out at people. (*Id.,* at 493). In her notes up appointment on May 31, 2006 (in regards to Godfrey's complaints that she was having abnormal menses and suffering from mood changes), Dr. Russell noted that Godfrey had no prior history of depression. (*Id.*, at

490).   In March 2007, Russell opined that Godfrey did not suffer from any psychiatric problems which would limit her ability to work. (*Id.*, at 251).

On April 26, 2007, Godfrey underwent an intellectual evaluation, a psychodiagnostic interview, and achievement testing with Milton Taylor, PH..D., a consultant with the Massachusetts Rehabilitation Commission Disability Determination Services. (*Id.,* at 269).   Dr. Taylor found that Godfrey's IQ was in the borderline range when compared to the general public with regard to intellectual functioning (her verbal IQ was determined to be 74, which is in the 4th percentile and her performance IQ was determined to be 80 which is in the 9th percentile). (*Id.*, at 272).   Dr. Taylor found that Godfrey "does not fit the classic profile of a learning disabled individual.   She is better classified as intellectually challenged with upper level borderline intellectual functioning." (*Id.*, at 273).   Dr. Taylor found that there were "no ostensible signs of any type of mood disorder" but that Godfrey was "mildly anxious secondary to life's circumstances," primarily regarding financial concerns (her husband was out of work and she was not working). (*Id.*, at 272). Godfrey was noted to have no suicidal, homicidal, or paranoid thoughts and her "affect [was] appropriate." (*Id.*).   Dr. Taylor rated her current GAF[2] at 60-65. (*Id.*, at 274).

In May 2007, Dr. Celeste Derecho, a non-examining state agency psychologist, completed a mental RFC assessment of Godfrey.   Dr. Derecho concluded that Godfrey: (1) can

---

[2] "A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school situations, but general functioning and the existence of some meaningful personal relationships.  A score between 51 and 60 indicates that the individual has moderate symptoms or moderate difficulty in social occupational, or school situations. 'A GAF score of 41-50 indicates an individual has serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job.)'" *Cruz v. Astrue*, No. 11-40054-FDS, 2012 WL 220535, *2 n. 2 (D.Mass. Jan. 24, 2012)(internal citations and citation to quoted case omitted).

understand and remember simple instructions; (2) can focus on a simple task over a two hour time frame, work in close proximity to others, make simple decisions, manage adequate pace and attendance at a full time job and would not require special supervision; (3) because of cognitive limitations, would have better job performance if she did not interact with the general public (otherwise, no limitations); and (4) would require reminders regarding changes in procedures (she would be expected to have adequate adjustment to most minor changes), can respond adequately to hazards, and cannot be described as having impaired judgment and would not have limitations on travel. (*Id.*, at 292).

In October 2007, Dr. Russell noted Godfrey had a "depressed affect" and cried during her examination. (*Id.*, at 438). In January 2008, Godfrey continued to complain of feeling depressed, having low energy levels and being unable to sleep (she was taking Ambien, which was not proving effective). (*Id.*, at 430). The patient was quoted saying "I just drag through the day, tell myself it's worth it." (*Id.*). Dr. Russell prescribed Fluoxetine to address Godfrey's depression. (*Id.*, at 433). In a July 2008 follow up evaluation, Dr. Russell found that "some of Godfrey's sleep difficulties are due to her depression." (*Id.,* at 521).

On August 20, 2008, Godfrey had an initial assessment for psychiatric evaluation with Theodore Jasnos,Ph.D, a licensed psychologist at North Central Human Services. (*Id.* at 560 - 563). Dr. Jasnos noted that Godfrey's presenting problems included mood fluctuations with depressed moods, tearfulness, high anxiety with distress, panic symptoms, irritability, frequent anger, loss of temper, disturbed sleep and appetite and delayed onset and awakening. (*Id.,* at 563). Dr. Jasnos noted that her problems were related to abuse she suffered as a child (triggered by a family reunion) and stress related to her injury. (*Id.*). Godfrey was also noted to have fleeting suicidal ideation specific to a recent family reunion and family problems. (*Id.,* at 561).

Dr.Jasnos's diagnosed Godfrey with: "Major depressive Disorder, Recurrent w Anger, Severe W/O Psychotic Features" and "PTSD, delayed Reaction." (*Id.,* at 563). He also noted that Godfrey had problems with her primary support group, problems related to her social environment, occupation and finances and educational problems. (*Id.).* Her GAF at the time of Dr. Jasnos's evaluation was 45 (serious symptoms); her highest GAF in the past year was noted to be 55 (moderate symptoms). (*Id.*).

On November 20, 2008, Dr. Russell noted that Godfrey was "[s]eeing a psychiatrist. Doing very well." She has been put on medication and her depression scores had improved. (*Id.,* at 513, 515). In April 2009, Dr. Russell saw Godfrey and noted that she cried during the exam and exhibited moderately depressed affect. (*Id.*, at 574). It appears that for financial reasons, Godfrey had stopped taking medications prescribed for her depression. (*Id.*, at 572).

Godfrey had eighteen visits with her clinician, Bokun Ogdebor, M.Ed., between Sept 12, 2008 and February 10, 2009. (*Id.*, at 542-559). Godfrey self reports that on a scale of one to ten (one being least depressed, ten being most depressed) she generally rates a 6-7. (*Id.*)

### *Claimant's Ability to Perform Everyday Activities; Claimant's Ability to Work*

Godfrey testified and/or reported that she is able to dress and bathe herself, get her son ready for school and clean the house. (*Id.,* at 31-32, 133). At the same time, she had trouble doing the laundry, could not lift her granddaughter and could not carry a gallon of milk up the stairs. (*Id.,* at 31-32, 35-36). During a typical day, she walked and sometimes drove. (*Id.*, at 131). Godfrey also stated that she could not spell or read well. However, she had no difficulty with memory or concentration, or with understanding or following instructions. She also followed written and spoken instructions "ok", and could pay attention "all the time". (*Id.*, at 141).

A vocational expert ("VE"), Elaine Cogliano, testified at the hearing. The VE was aware of Godfrey's past work experience as a waitress, and folder of paper products; she characterized those occupations as light exertion, semi-skilled. (*Id.,* at 37-39). She characterized Godfrey's past work as a key cutter as light exertion, unskilled[3] and her past work as a packer as medium exertion, unskilled. (*Id.*, at 39).

The ALJ presented the VE with a hypothetical in which she asked the VE to assume the following facts:

- An individual who can perform work at the light exertional level.
- The individual can sit, stand, and walk a maximum of six hours in each day and will have to have a sit/stand option every 60 minutes for no more than five minutes at a time. Postural limitations will be occasional: climbing, kneeling, crawling, crouching and ladders. Also, frequent: stopping, balancing and avoiding hazardous machinery. The individual would have no limitations on the use of the hands and no environmental limitations.

- The individual would have no mental limitations, except for only occasional interaction with the public.

(*Id.,* at 39). The VE testified that the individual would be able to perform Godfrey's past relevant work as a paper folder. (*Id.*). The ALJ then suggested the following second hypothetical to the VE:

- An individual who can perform sedentary work.

- The individual walk a maximum of two hours in each day and six hours maximum standing in each day. The individual would require a break from standing every 60 minutes.

- The individual would have no mental limitations, except for only occasional interaction with the public.

---

[3]When Godfrey described how she performed the key cutter job, the VE revised her opinion and found that it would be medium/heavy exertion. (*Tr.*, at 40).

The VE testified that Godfrey would not be able to perform her past relevant work, but there are job in the national or regional economy that such an individual could perform such as a surveillance system monitor (400 positions in Massachusetts, 20,000 nationally), an information clerk (1,000 in Massachusetts, 80,000 nationally), and an inspector (800 in Massachusetts, 38,000 nationally). (*Id., at 42-43*).

Godfrey's attorney then asked the VE to assume the following facts:

- An individual who could sit no more than 45 minutes, stand no more than 10 minutes and able to sit and stand or walk less than 2 hours at a time within an 8 hour day without having to take a rest. The individual would need to shift positions at will and would require unscheduled breaks of five to ten minutes. The individual would also need to use a cane or other walking device, could not lift more than ten pounds occasionally and could not crouch or stoop forward more than five percent.

(*Id.*, at 43-44).

The VE testified that this individual could not perform the previously listed sedentary jobs, nor would there be any other jobs available for such an individual in the marketplace. (*Id., at* 44). The ALJ then amended her second hypothetical to include the use by the individual of a cane or other walking device. The VE stated that use of a cane or walking device would not make a difference, that is, the individual could still perform the sedentary jobs she had listed. (*Id.,* at 44-45).

### 4. *The ALJ's Findings*

The ALJ made the following findings:

1) Godfrey had not engaged in substantial gainful activity and has not worked since July 18, 2006. (*Id.,* at 9).

2) Godfrey had the following severe impairments: right tibial fracture; borderline intellectual functioning; difficulty ambulating. (*Id.*) The ALJ determined that these impairments were severe because they had more than a minimal effect on her ability to perform work related activities**.** (*Id.*)

3) Considering Godfrey's mental health status, the ALJ found that her "mental status examination revealed no evidence of disordered thought processes, cognitive dysfunction, or significant intellectual deficits." The ALJ further found that "[d]espite her allegations to the contrary, there is little indication that the claimant is affected by any more than mild depression or anxiety". The ALJ concluded that Godfrey's alleged mental impairment was "non-severe". (*Id.*, at 10).

4) Godfrey "did not have an impairment or combination of impairments that met or medically equated" a listed impairment. (*Id.*) More specifically. the ALJ found that Godfrey's: (i) tibia fracture did no meet or medically equate with a listed impairment because the evidence did establish "a lack of solid union or inability to ambulate effectively"; (ii) mental impairment was considered, but did not meet the requisite requirements; and (iii) has only mild restrictions regarding her activities of daily living, no difficulties with social functioning, moderate difficulties with concentration, persistence or pace, and no episodes of decompensation. (*Id.,* at 10-11.)

5) Godfrey had the RFC to perform "sedentary work . . . except that she requires a break every 60 minutes [, is] limited to no more than occasional exposure to the public ... [and] requires the use of an assistive device for any walking and standing." (*Id.*, at 12). In so finding, the ALJ determined that "the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the ... residual functional capacity assessment". The ALJ further found that the objective evidence, while providing some support for Godfrey's allegations, "does not support the elevated level of impairment alleged". The ALJ went on to outline the objective evidence. The ALJ did not accept the more restrictive limitations imposed by Dr. Russell, Godfrey's treating physician, because they were not justified by the record medical evidence. Given the inconsistencies with the medical record and that there is no evidence that Dr. Russell objectively tested Godfrey's physical abilities, the ALJ gave her medical opinion only some evidentiary weight. (*Id.*).

6) Godfrey was unable to perform any past relevant work. (*Id.,* at 14).

7) Given Godfrey's age, education and work experience and RFC, there are jobs in the national economy that Godfrey could perform. (*Id.*, at 15).

8) Godfrey has not been under a disability, as defined in the Act, at any time from July 18, 2006 (the alleged onset date) through September 30, 2009 (the date last insured). (*Id.*, at 16).

### Discussion

1. *Standard for Entitlement to Disability Insurance Benefits*

To qualify for disability insurance benefits, a claimant must demonstrate that s/he is disabled

within the meaning of the Act. The term "disability" as the defined in the Act is the "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §1382c(a)(3)(A). The impairment(s) must be severe enough to prevent the claimant from performing not only his or her past work, but also any substantial gainful work existing in the national economy. 42 U.S.C. §423(d)(2)(A); 20 C.F.R 404.1560(c)(1). In making such determination, the ALJ must assess the claimant's RFC in combination with the "vocational factors, [including the claimant's] age, education, and work experience". 20 CFR § 404.1560(c)(1).

To determine disability, the ALJ evaluates the claimant's application utilizing the following five-step analysis:

> 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; [and] 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

*Seavey v, Barnhart*, 276 F.3d 1, 5 (1ˢᵗ Cir. 2001). It is the applicant's burden to show at Step 4 that s/he is not able to do past relevant work as the result of a "significant limitation;" if the claimant meets his/her burden, "the Commissioner then has the burden at Step 5 of coming forward with evidence of specific jobs in the national economy that the applicant can still perform." *Id.*; *see also* 42 U.S.C. 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the [ALJ] may require."). It should also be noted that "[a]ll five steps are not applied to every

applicant, as the determination may be concluded at any step along the process". *Seavey*, 276 F.3d at 5.

## 2. *Court's Review Of Commissioner's Decision*

Pursuant to the Act, this Court may affirm, modify or reverse the Commissioner's final decision, with or without remanding the case for rehearing.  42 U.S.C. § 405(g).  This Court reviews the Commissioner's final decision to determine whether: (i) the correct legal standard was applied, and (ii) the decision was supported by substantial evidence. *Id.,* at 9; *see also* 42 U.S.C. §405(g).  While  the Court's review of questions of law is *de novo,* the Court defers to the Commissioner's findings of fact, so long as they are supported by substantial evidence.  *Seavey*, 276 F.3d at 9, 10. Substantial evidence is that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v.* Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971); *see also Ortiz v. Sec'y of Health & Human Servs.,* 955 F.2d 765, 769 (1st Cir. 1991)(even if administrative record could support multiple conclusions court must uphold Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.")

In applying the "substantial evidence" standard, the Court must bear in mind that it is the province of the ALJ, not the Court, to find facts, decide issues of credibility, draw inferences from the record, and resolve conflicts in the evidence. *Ortiz,* 955 F.2d at 769. Ultimately, the Court may affirm, modify, or reverse the Commissioner's decision, with or without remanding the cause for a rehearing, 42 U.S.C §405(g)[4], but reversal is warranted only if the ALJ

---

[4]  Section 405(g) provides that "[t]he [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive....".

committed a legal or factual error in evaluating a claim or if the record contains no "evidence rationally adequate…. to justify the conclusion." *Roman-Roman v. Commissioner of Social Security*, 114. Fed. App'x. 410, (1ˢᵗ Cir. 2004); *see also Manso-Pizarro v. Sec'y of Health and Human Services*, 76 F. 3d. 15 (1ˢᵗ Cir. 1996).

### 3. *Whether the Commissioner's Decision Should be Affirmed*

The ALJ undertook to apply the required five step sequential analysis. At Step 3, the ALJ determined that neither Godfrey's physical or mental impairments met or medically equaled a "listed" impairment. At steps 4 and 5, the ALJ determined that based on her RFC, Godfrey could not perform her past relevant work, but that she does have a RFC for sedentary work, with a need for frequent breaks and the use of a cane. The ALJ further determined that given Godfrey's age, education, work experience and RFC, she was capable of making a successful adjustment to other work that existed in significant numbers in the national economy.

Godfrey makes the following arguments in support of her motion: first, that the ALJ did not give proper weight to the opinion of Godfrey's treating physician when the ALJ determined that Godfrey's psychiatric impairment was limited only by occasional exposure to the public and the ALJ improperly adopted a lay opinion that there is "little indication that the claimant is affected by any more than mild depression or anxiety," while ignoring the treatment notes from North Central Human Services reports because they were based on Godfrey's subjective complaints; second, the ALJ improperly rejected the opinion of Dr. Russell, Godfrey's treating physician, because the doctor's evaluation was based on the complainant's subjective complaints of pain, which were not "objectively tested"; third, when posing hypothetical questions to the VE for purposes of determining Godfrey's ability to work, the ALJ failed to include significant factors, such as Godfrey's literacy limitations and/or emotional deficiencies, which rendered the jobs

identified by the VE and adopted by the ALJ of little value; fourth, the ALJ appeared to base her finding on her own "predilections" rather than expert medical testimony; and fifth, the ALJ did not properly evaluate Godfrey's credibility. *Mem. in Sup. of Pl's Mot. to Revise or Remand the Dec. of the Comm. of the Soc. Sec. Admin.* (Docket No. 14), at pp. 1-4.

The Commissioner, on the other hand, argues that the ALJ's decision should be affirmed because: the ALJ properly determined that Godfrey's complaints of disabling symptoms were not credible in light of her daily activities and the objective evidence which showed mild or improved symptoms; the ALJ properly assessed the medical record opinions, which reflected that Godfrey's condition had improved; and the ALJ's did not err by failing to include literacy limitations in the hypothetical to the VE given that Godfrey had worked for years subject to that limitation. *Def's Mem. of Law in Sup. of Mot. for an Order Affirm. the Dec. of the Comm.* (Docket No. 19)("*Def's Mem.*), at 1.

It is true, as Godfrey contends, that "[w]ith few exceptions ... an ALJ, as a lay person, is not qualified to interpret raw data in a medical record". *Manso-Pizarro*, 76 F.3d at 17. At the same time, "where the medical evidence shows relatively little physical impairment, an ALJ permissibly can render a commonsense judgment about functional capacity even without a physician's assessment." *Id.* Additionally, the ALJ has the discretionary power to discount medical opinions that are inconsistent with the majority of medical evidence in the record. *Keating v. Sec'y of Health and Human Servs.,* 848 F.2d 271, 276 (1st Cir. 1988); *see also*, *Haidas v. Astrue*, 2010 WL 1408618 (D.Mass. Mar. 31, 2010)(citing *Morales v. Comm'r of Soc. Sec.*, 2 Fed. App'x 34, 36 (1st Cir. 2001)).

This is a difficult case, both for the ALJ and reviewing court. The difficulty comes because particularly with respect to Godfrey's alleged physical impairments, neither the objective

medical evidence, nor the evidence regarding her daily activities support her subjective complaints. For instance, on January 29, 2008, Dr. Russell saw Godfrey and noted that her gait was normal and with respect to her right lower extremity: "No misalignment or tenderness. Full range of motion. Normal stability, strength and tone". (*Tr.*, at 433). On April 15, 2008, Dr. Russell made the following notation concerning Godfrey's fractured tibia and fibula: "The patient's condition has improved. Now with adequate pain control". (*Id.*, at 417). Indeed, through the relevant time period (into 2009), the primary negative notations Dr. Russell makes regarding Godfrey's right leg was that she had suffered a fractured tibia and fibula and suffered chronic pain and occasional swelling; on one occasions Dr. Russell noted that Godfrey's toes go numb and she suffers restless legs at night, with "prickly" sensations in her right lower leg. (*Id.*, at 519). Under the circumstances, there is substantial evidence so support the ALJ's finding that Dr. Russell's medical notes simply do not support the highly restrictive limitations which she imposed with respect to the RFC assessment of Godfrey she prepared in March 2009. Additionally, there is substantial evidence in the record to support the ALJ's findings regarding Godfrey's alleged psychiatric impairments. That is, the record evidence suggests that to the extent that such impairments exist, they were either controlled by medication or would not create any limitations on her ability to work.

Godfrey next argues that the ALJ failed to carry out an adequate credibility assessment as required by the Commissioner. The ALJ found Godfrey's testimony not credible "to the extent that statements were inconsistent" with her stated RFC. (*Tr.* at 12). The First Circuit has noted, "that complaints of pain need not be precisely corroborated by objective findings, but they must be consistent with medical findings." *Dupuis v. Sec'y of Health and Human Servs.*, 869 F.2d 622, 623 (1st Cir. 1989). Additionally, the ALJ's determination concerning a claimant's complaints of

pain and external limitations "must be supported by substantial evidence and the ALJ must make specific findings as to the relevant evidence [s/he] considered in determining to disbelieve the [claimant]". *DaRosa v. Sec'y of Health and Human Servs.*, 803 F. 2d 24, 26 (1st Cir. 1986).  In Godfrey's case, the ALJ  fully considered the medical record as a whole and was sufficiently specific as to why she did not give much weight given to Godfrey's statements, *i.e.,* why she found that Godfrey's statements "concerning the intensity, persistence and limiting effects of these symptoms are not credible". *See Tr.* at 12-13.  Therefore, the court will not disturb the ALJ's credibility determination.

Godfrey's final argument contends that while the ALJ herself acknowledged that Godfrey is intellectually challenged, when giving the proposed hypothetical to the VE, she failed to include Godfrey's limited intellectual capacity and related mental limitations.  Godfrey argues that the ALJ's failure to include these significant limiting factors rendered the VE's testimony valueless.

At the administrative hearing, the ALJ uses VEs to identify jobs in the national economy that a claimant can perform based on hypotheticals which describe the claimant's limitations. The First Circuit requires that for  "a [VE's] answer to a hypothetical question to be relevant, the inputs into that hypothetical must correspond to conclusions that are supported by the outputs from the medical authorities." *Arocho v. Sec'y of Health and Human Servs.*, 670 F.2d 374, 375 (1st Cir. 1982).  Where the ALJ's hypothetical to the VE does not include all of the claimant's limitations, "then the [VE's] response will assuredly be irrelevant and may not be relied on by the [ALJ]". *Huertas v. Astrue*, Civ. Act. No. 11-30064-KPN, 2012 WL 592743 (D.Mass. Feb. 21, 2012).

Prior to proposing any hypotheticals, the ALJ confirmed that the VE was familiar with Godfrey's record, which would include the findings concerning Godfrey's borderline intellectual

functioning and the fact that her past work included only unskilled and semi-skilled labor. However, the ALJ did not include any limitations related to Godfrey's borderline intellectual capacity (such as literacy limitations) in her hypothetical to the VE. The ALJ's hypothetical also did not mention the limitations contained in Godfrey's mental RFC, *i.e.,* that she had moderate limitations with respect to the ability to understand and remember detailed instructions and the ability to carry out detailed instructions, nor did it include the findings in a related evaluation that Godfrey suffered moderate limitations with respect to difficulties in maintaining concentration persistence or pace (*Id.*, at 286, 290)[5].

The Commissioner argues that while the ALJ's hypothetical did not specify any of the aforementioned limitations, the ALJ essentially incorporated such limitations by limiting Godfrey to "sedentary" work, which the Commissioner asserts "generally incorporates an unskilled base". (*Def's Mem.*, at 17). The Commissioner further argues that at least two of the jobs proposed by the VE were unskilled, the ALJ's determination is supported by substantial evidence. I disagree.

The evidence in the record is clear that Godfrey is intellectually challenged, which affects her ability to follow instructions, concentrate and interact with others. Her ability to read and write is limited as is her ability to anything other than simple mathematics. It is true that in the past Godfrey has previously worked and functioned with little difficulty. However, it is uncontroverted that Godfrey can no longer engage in her past work and because the ALJ's hypothetical did not include the aforementioned mental limitations, the VE's conclusions

---

[5] Based on such findings, the examiner concluded that Godfrey could understand and remember *simple* instructions, focus on *simple* tasks over a two hour period and could follow *simple* instructions and make *simple* decisions. She would not require special supervision and could manage adequate pace and attendance at a full time job. The examiner also concluded that it would be best if Godfrey did not have to interact with the public due to her cognitive limitations. (*Id.*, at 292).

concerning the specific jobs in the economy which Godfrey can perform can be given no weight.[6] Therefore, the ALJ's vocational determination is not supported by the substantial evidence and the case is reversed and remanded for further hearing to permit further findings on the issue of Godfrey's ability to perform other work in the economy with the appropriate limitations regarding her intellectual and mental capabilities. Specifically, the case is remanded so that the ALJ may elicit further VE testimony consistent with this opinion[7].

**Conclusion**

Accordingly:

Plaintiff's Motion to Reverse or Remand the decision of the Commissioner of the Social Security Administration (Docket No. 13) is ***allowed*** and Defendant's Motion for an Order Affirming the Decision of the Commissioner (Docket No. 18) is ***denied***. This matter is remanded to the ALJ for further proceedings consistent with this Decision.

**/s/ Timothy S. Hillman**
TIMOTHY S. HILLMAN
U.S. MAGISTRATE JUDGE

---

[6] Upon remand, it may very well be that given an inclusive hypothetical, the VE would come to the same conclusion, *i.e.* there are jobs of significant numbers in the national economy which Godfrey can perform, including the three jobs which were previously specified. The Court does not express any opinion as to this issue.

[7] Godfrey has requested that the Court reverse the decision of the Commissioner or remand her claim for further hearing. The Court will reverse the Commissioner and award benefits only in those cases where the proof of disability is overwhelming, or the proof is very strong and no contrary evidence exists. *Seavey*, 276 F.3d at 11. This is not a case where reversal is appropriate.